Plaintiff alleged that on October 19, 1945, he purchased from the Sapaugh Motor Company, composed of L.E. Stansbury and Floyd Sapaugh, a 1941 Chevrolet Master DeLuxe coupe for $1,350 cash, and that the ceiling price of the car at the time in Shreveport, Louisiana, as fixed by the Price Administrator, under the Emergency Price Control Act of Congress of 1942, as amended, 50 U.S.C.A.Appendix, 901 et seq., was $802 without "dealer warranty". He seeks in this suit to have said company and its alleged component members condemned in solido to pay him three times the difference between the ceiling price and the price paid by him for the car, plus reasonable attorney's fee for instituting and prosecuting this suit, all as authorized by the mentioned Federal statute. He also alleged that in violating said act, defendants acted knowingly and wilfully.
Plaintiff, being uncertain whether the relation of Sapaugh and Stansbury in buying and selling used cars generally constituted or superinduced a commercial copartnership between them, by supplemental petition, in the alternative, alleged that under the facts of this case their relation was such as to render them jointly, severally and in solido liable to him for the amounts for which he sued. Other alternative obligations, having reference to the liability of these parties to plaintiff embraced in second supplemental petition, need not be epitomized here as Stansbury, since this appeal was perfected, has passed out of the case.
Sapaugh and Stansbury, by separate answers, denied specifically each and every allegation of the original and supplemental petitions. These blanket denials did not except the sale to plaintiff.
There was judgment in favor of plaintiff and against all defendants in solido for $1,503.57, in principal, with legal interest thereon from June 4, 1946, and for $300 attorney's fee. Defendants appealed.
Appellants do not complain of the principal amount of the judgment if it be held that the predicate upon which it is based is warranted in law.
On May 22, 1947, the suit as between plaintiff and Stansbury was compromised by the latter paying $500 in cash, and he was thereby fully released from any further liability to plaintiff under the judgment. Plaintiff's rights as against Sapaugh and the Motor Company were expressly reserved in the instrument evidencing the compromise agreement.
[1] The reasons for judgment were not reduced to writing. We do not know on what theory Stansbury was held liable in solido with the other defendants; that is, whether the lower court found that his and Sapaugh's relationship constituted a commercial copartnership, or whether it was found that they became in solido bound to plaintiff because, acting in concert, they knowingly violated a Federal statute and the rules and regulations designed *Page 235 
to carry same into effect, in selling the car to plaintiff for a price in excess of that fixed by the Price Administrator. Surely, the testimony in the case establishes in solido liability on the latter theory.
There now remains for determination the primary question: Was the car sold for a price in excess of that fixed by the OPA, and, if so, what was the amount of such excess? The measure of liability, if any, depends upon whether the sale was made with "dealer's warranty" or not. If the sale was made with "dealer's warranty" the defendants in fixing a price had the right to add to the base price of the car or $802, an amount equal to 25% thereof and like percentage of cost of attachments placed thereon by them, and then increase this total by 1% thereof to cover Louisiana Sales Tax. If the sale was made without warranty the amount of profit the dealer could charge is materially less than if made with warranty.
Sapaugh and Stansbury both testified that the latter had no interest in the Sapaugh Motor Company; that this trade-name was adopted by Sapaugh who was the sole owner of the business conducted under that name. Its business, it seems, consisted exclusively of buying and selling used motor vehicles.
At the time the sale was consummated there was delivered to plaintiff by Ray Reynolds, salesman of the motor company, a carbon copy of his written order for the car wherein the price is stated to be $1,041.40, exclusive of Louisiana Sales tax, or $10.41. In the printed part of this copy it is stated that the mileage on the car is not guaranteed and that the purchaser "agrees to take the car As Is", whereas, on the original of the order, produced in response to a subpœna duces tecum, appears the following written in lead pencil: "Warranty: Mileage 50,055", and the words: "As Is" are deleted therefrom. Obviously these additions to and the deletion from the order, made after delivery of the copy to plaintiff, were intended to effect one important change, viz.: convert the sale from one of nonwarranty to one of warranty, without plaintiff's knowledge or consent. Of course, the effort was without effect. Plaintiff testified that the question of warranty of the car's mechanical condition was not discussed. The original order, signed by him, clearly supports him in this respect. This instrument in its original form was intended to protect defendants against come-back on them by plaintiff if the car's mechanical condition proved unsatisfactory; and the changes therein were designed to justify price based upon a "dealer's warranty".
Reynolds also testified that the question of warranty was not discussed, and that he prepared the papers to effect the sale in accordance with Stansbury's directions.
Under the regulations issued by the OPA it was made the duty of each dealer who sold a used car with warranty, at the time to prepare, sign and deliver to the purchaser what is called a "Dealer's Warranty", which, inter alia, should contain the following, to-wit: "The used car described below, including any equipment named in Appendix D of Maximum Price Regulation 540, is hereby warranted to be in good condition under normal use and service for a period of 30 days after delivery, or 1,000 miles, whichever may first occur."
Another provision required to be inserted in this document relates to the obligation of the dealer to repair the car in order to put it in good operating condition, if such became necessary and the car was delivered to it for this purpose within the thirty day period following date of sale. The requirements of this regulation were not observed by defendants. The instrument was not delivered or sent to plaintiff although it appears that it was made up and signed. There was good reason from defendants' standpoint for not providing plaintiff with the instrument or a copy of it. It was intended that so far as concerned him, the sale was without warranty.
The testimony and the documentary evidence in the case establish conclusively that the sale to plaintiff was made without warranty. Therefore, the maximum price plaintiff should have been charged for the *Page 236 
car was $802, plus cost of radio and heater, $40, and sales tax of $8.42, or a total of $850.42.
The day before plaintiff purchased the car he, accompanied by a sister, was in Shreveport looking for a car of the make and model involved herein. He had not then been discharged from the military service and was wearing the uniform of a soldier. He stopped at defendants' used car lot and there met Stansbury to whom he made known his desire to purchase a car, giving to him the model and make he preferred. Stansbury told him that he had exactly the car he wished but that it was not then on the lot. He priced the car at $1,350. On the following day plaintiff returned and again discussed with Stansbury the purchase of the car. They agreed on a sale for the price previously fixed by Stansbury. He then called Reynolds, who Sapaugh admits was fully authorized by him to sell his cars and fix terms of sale, and instructed him to prepare the papers needful for closing the sale. Sapaugh was then absent. Reynolds prepared the order for the car, above referred to, and a bill of sale thereof. He testified that plaintiff requested him to draw a check on his bank at Plain Dealing, Louisiana, for the price at which, according to Reynolds, it was being sold, to-wit: $1,051.81; and, also he says, plaintiff asked him to draw another check on same bank payable to cash, for $298.19, which was done. The larger check was made payable to Sapaugh Motor Company. Both checks were signed by plaintiff and left on the company's desk where drawn. It so happens that the two checks make up exactly $1,350. This could not have been a coincidence. Sapaugh Motor Company endorsed the larger check with stamp and the smaller one was endorsed by plaintiff for reason not shown. He was asked to do so by Reynolds. Both checks were delivered to Stansbury the following day, and he testified that they were deposited to his bank account. Reynolds admits that plaintiff received no cash whatever on the smaller check. Notwithstanding these established facts, Reynolds, Sapaugh and Stansbury have the effrontery to testify, and seemingly expect a court of justice to believe them, that plaintiff paid for the car only the sum of $1,051.81, a price, they say, not above that fixed by the OPA.
The modus operandi between Stansbury and Sapaugh was shrouded in a maze of detail wholly unusual to straight forward business transactions, and was obviously designed and followed to circumvent laws, rules and regulations adopted by the Government and its agencies to protect its citizens against imposition during the emergency created by war conditions.
It appears that Sapaugh owned and leased the lot on which he conducted an extensive used car sale business in the City of Shreveport. Stansbury bought used cars wherever he could find them and delivered them for sale to the lot of Sapaugh. He testified that he continued to own them until sold by himself or Sapaugh and then they became the property of Sapaugh. This, of course, does not make sense as the cars, when sold to individuals, became the property of such individuals He also testified that he fixed the sale price of each car he delivered to the lot and, when sold, he charged Sapaugh with the price.
Sapaugh was ordered to produce in court bank deposit slips issued to him and bank statements rendered to him during the months of October and November, 1945. To justify his failure to comply with the court's order, he baldly testified that he always destroyed deposit slips immediately after being delivered to him and cast into the paper waste basket monthly bank statements with canceled checks as soon as received. This testimony is astounding, coming from a business man whose annual transactions doubtless run into scores of thousands of dollars.
Sapaugh and Stansbury both testified that no books were kept to reflect financial conditions between them; that often from sales of cars, Sapaugh would be due Stansbury many thousands of dollars and that a lump-sum settlement would be made from time to time. Stansbury testified that Sapaugh was given credit for the check of $1,051.81 but he was not frank enough to divulge the ultimate destiny of the proceeds of the other check. *Page 237 
[2] Evidently complete details of the arrangements between Stansbury and Sapaugh involving the delivery and sale of used cars is not disclosed by the record. They were engaged in business for profit and each had the same interest, so far as possible, in keeping secret some of the conditions that governed their relations. In the present instance each profited from violation of law, rules and regulations that should have been observed by them.
[3] Sapaugh complains that the amount of attorney's fee fixed by the lower court is excessive. We do not agree with this contention. The fee is less than 20% of the amount claimed. Attorneys, we know, as a rule, do not institute and prosecute suits for the collection of money for a less percentage of the amount involved.
[4] The law and the evidence amply justify the judgment rendered below, and, for the reasons herein assigned, it is affirmed. However, the judgment should be credited with the $500 paid by Stansbury as of May 22, 1947, and it is so ordered. All costs are assessed against the remaining defendants.